USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT _________________________ No. 96-1868 LOUIS BOVERI AND ROSE BOVERI, Plaintiffs, Appellants, v. TOWN OF SAUGUS, ET AL., Defendants, Appellees. _________________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Mark L. Wolf, U.S. District Judge] ___________________ _________________________ Before Torruella, Chief Judge, ___________ Selya and Boudin, Circuit Judges. ______________ _________________________ Edmund M. Pitts, with whom Edmund R. Pitts and Pitts & Pitts _______________ _______________ _____________ were on brief, for appellants. Philip Burling, with whom Gregory T. Moffatt, Feriale _______________ ____________________ _______ Abdullah, Foley, Hoag & Eliot, Judith R. Cohen, and Adams & Koss ________ ____________________ _______________ ____________ were on brief, for appellees. _________________________ May 12, 1997 _________________________ SELYA, Circuit Judge. The instant appeal tests the SELYA, Circuit Judge. _____________ margins of the "shock the conscience" standard that this court articulated in Evans v. Avery, 100 F.3d 1033 (1st Cir. 1996). _____ _____ Finding, as we do, that the conduct complained of does not cross the Evans line, we affirm the entry of judgment for the _____ defendants. Because the district court terminated the plaintiff's case1 on summary judgment, Fed. R. Civ. P. 56, we assess the record in the light most flattering to him and draw all supportable inferences in his favor. See Garside v. Osco Drug, ___ _______ __________ Inc., 895 F.2d 46, 48 (1st Cir. 1990). ____ The curtain rises in Saugus, Massachusetts. Shortly after 9:00 p.m. on December 28, 1990, Saugus police officers Michael McGrath and David Putnam were on patrol in a police cruiser. They received notice of a disturbance at a McDonald's restaurant on Route 1. As it passes through Saugus, Route 1 has six travel lanes (three northbound and three southbound). The posted speed limit is 45 miles per hour. At the time of the events in question, weather conditions were execrable: a mixture of snow and rain, with slush beginning to form on the road in spots. In the course of responding to the reported disturbance, the officers received a second radio dispatch to the  ____________________ 1In actuality, there are two plaintiffs: Louis Boveri and his wife, Rose Boveri. Inasmuch as Rose's claim is entirely derivative of her spouse's, we treat the appeal as if Louis were the sole plaintiff. 2 effect that the individuals involved were leaving the scene in a small, dark-colored Honda automobile. The officers arrived just as a car matching the reported description pulled out of the restaurant's parking area and sped north on Route 1. The officers followed, activating their siren and blue lights. Instead of stopping, the Honda accelerated. The officers gave chase. The pursuit continued along Route 1 at speeds in excess of 80 miles per hour for more than three miles. Throughout, the officers remained only a few car lengths to the rear, and the driver of the Honda, James Wade, desperately attempted to elude them. Under Wade's aegis, the Honda weaved from lane to lane and tried to use other vehicles to obstruct the trailing police cruiser. At one point, the Honda left the road, did a 360-degree spin, and returned to the highway. Wade later described the chase as being "like a video game." In Lynnfield, the Honda left Route 1 via the Route 129 exit. The plaintiff's vehicle was ahead of the Honda, signaling to turn right. Wade could not stop in time and the Honda hydroplaned into the plaintiff's car, instigating a chain collision. Officers McGrath and Putnam arrived at the scene instantaneously, apprehended Wade, and summoned medical assistance for the plaintiff (who had sustained severe injuries).2  ____________________ 2Wade subsequently entered a guilty plea to charges of aggravated rape, burglary, and larceny of a motor vehicle. We assume for purposes of this appeal that the officers were not 3 The plaintiff sued McGrath, Putnam, and the municipality under 42 U.S.C. 1983 (1994), alleging principally that the officers' conduct violated his right to substantive due process. The district court granted summary judgment in the officers' favor based on qualified immunity, concluding that the officers' conduct did not violate clearly established federal constitutional or statutory rights of which a reasonable police officer would have known. This appeal followed.3 Summary judgment is proper only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Our review of the district court's application of the rule is plenary. See Garside, 895 F.2d at 48. ___ _______ While this appeal was pending, we seized an opportunity to clarify the appropriate legal standard for claims that a police pursuit violates substantive due process. See Evans, 100 ___ _____ F.3d at 1038. We apply that standard here, mindful that the lower court's rationale does not delimit the scope of appellate review. An appellate court may, if it chooses to do so, affirm a summary judgment on any alternative ground supported by the record. See Hachikian v. FDIC, 96 F.3d 502, 504 (1st Cir. 1996). ___ _________ ____  ____________________ aware that the Honda was stolen or that its driver was implicated in rape and burglary. 3Only the officers moved for brevis disposition, yet the ______ trial court entered judgment for all three defendants (including the town of Saugus). Because the plaintiff has not assigned error to that seeming irregularity, we deem any objection to be waived. 4 It is by now axiomatic that 42 U.S.C. 1983 supplies a private right of action against a person who, acting under color of state law, deprives another of federally secured rights. Acting under this rubric, claimants harmed by police misconduct occurring outside the context of a seizure theoretically may bring suits alleging the deprivation of rights protected by the substantive component of the Due Process Clause. See Evans, 100 ___ _____ F.3d at 1036. But the Supreme Court has cautioned against interpreting the Due Process Clause so extravagantly that it "impose[s] federal duties that are analogous to those traditionally imposed by state tort law." Collins v. City of _______ ________ Harker Heights, 503 U.S. 115, 128 (1992). ______________ There is another caveat applicable here. Police pursuits have a special dimension: although they are dangerous and inevitably create risks to bystanders, they are at the same time an essential law enforcement tool for the apprehension of suspects. See Evans, 100 F.3d at 1038. To use the tool, ___ _____ however, police officers are forced to make instantaneous judgments about how to balance the legitimate needs of law enforcement and the risks to public safety. See id. Conscious ___ ___ of the difficult nature of this balancing act, we determined in Evans that "in order for a high-speed police pursuit to intrude _____ upon substantive due process protections, the officers' conduct must not only manifest deliberate indifference to the plaintiff's rights, but must also shock the conscience." Id. The Evans ___ _____ paradigm is fully applicable in the instant case. 5 Applying Evans, we are satisfied that the district _____ court appropriately granted brevis disposition. When the ______ officers first spotted the Honda, they had good reason to attempt to stop it. They knew that its driver and his passenger had created a disturbance at McDonald's. From their experience with such disturbances, coupled with the Honda's rate of speed, the officers were justifiably concerned that the driver was under the influence of alcohol (a concern which doubtless was magnified by the officers' awareness that New Year's Eve was approaching). When the Honda initially failed to stop despite the siren and flashing lights, the stakes increased. At that juncture, the officers were warranted in mounting a pursuit; leaving such a driver on the road would not only stymie law enforcement but also endanger the public. To be sure, as the chase progressed, the Honda's wild driving plainly created an escalating risk of harm to bystanders but the officers' continuation of the pursuit must be judged against the exigencies of the situation that had developed. The law enforcement interest in apprehending the Honda had grown, as had the danger to the public inherent in leaving a reckless (potentially inebriated) driver on the road. Under Evans, the _____ question is not whether the officers' decision to dog the Honda was sound decisions of this sort always involve matters of degree but, rather, whether a rational jury could say it was conscience-shocking. Here, as in Evans, we think not.  _____ The plaintiff asseverates that this case is materially 6 different from Evans because, here, the officers' conduct _____ violated departmental rules, state law, and an order from the dispatcher to cease and desist. But to the extent that this asseveration is supported by the record, these attributes, individually and collectively, do not suffice to tip the scales. We explain briefly. The plaintiff's assertion that the officers violated departmental rules finds some purchase in the record. A 1988 memorandum authored by the Saugus police chief, Donald M. Peters, directs officers to "engage in high speed chases only in cases of serious felonies." Although it turned out that the officers' quarry had committed serious felonies (rape, burglary, and larceny of a motor vehicle), it is uncertain whether the officers had any inkling of this circumstance. See supra note 2. Still, ___ _____ assuming for argument's sake that McGrath and Putnam mounted the chase in contravention of a departmental regulation, the violation would not transgress the "shock the conscience" standard. A regulatory violation, like a violation of state law, is not inherently sufficient to support a 1983 claim. See ___ Martinez v. Colon, 54 F.3d 980, 989 (1st Cir.), cert. denied, 116 ________ _____ _____ ______ S. Ct. 515 (1995); PFZ Properties, Inc. v. Rodriguez, 928 F.2d _____________________ _________ 28, 32 (1st Cir. 1991); Amsden v. Moran, 904 F.2d 748, 757 (1st ______ _____ Cir. 1990) ("Even bad-faith violations of state law are not necessarily tantamount to unconstitutional deprivations of due process."); see also Davis v. Scherer, 468 U.S. 183, 196 (1984) ___ ____ _____ _______ 7 (rejecting argument that an official's conduct is objectively unreasonable when it violates a statute or regulation and admonishing that it is not "always fair, or sound policy, to demand official compliance with statute and regulation on pain of money damages"). While departmental regulations are helpful in measuring police officers' conduct against the Evans benchmark, _____ courts must look past the regulations to the officers' underlying actions to determine whether their behavior shocks the conscience (and, thus, violates a plaintiff's right to substantive due process). See Temkin v. Frederick County Comm'rs, 945 F.2d 716, ___ ______ ________________________ 723 (4th Cir. 1991) (applying this principle in a police pursuit case). There is nothing in state law that supports the plaintiff's contention that the officers' actions shock the conscience. In this regard, the plaintiff's main claim to the contrary that the officers abridged state law by driving in excess of the speed limit is a figment of his mischaracterization of the legal rules governing the operation of emergency vehicles. Massachusetts law allows a police officer to exceed the speed limit "in an emergency and while in performance of a public duty . . . if he exercises caution and due regard under the circumstances for the safety of persons and property." Mass. Gen. L. ch. 89, 7B (1989). While the plaintiff might argue plausibly that the officers failed to exercise due care in pursuing the Honda, negligence under state law does not amount to a constitutional violation. We do not believe that any court, on 8 this scumbled record, could find the officers' possible negligence to be conscience-shocking. The plaintiff's final point is cut from the same cloth. The plaintiff asserts that McGrath and Putnam ignored an instruction by a supervisory officer, issued through the dispatcher, to break off their pursuit of the Honda. Although there is no evidence in the record to support this assertion, Judge Wolf noted that he would have allowed further discovery to investigate it had he found it to be outcome-determinative. Even assuming, therefore, that this claim is factually correct, a supervisor's judgment that a pursuit should be halted neither increases nor decreases the risks inherent in the pursuit itself. In the circumstances of this case a brief chase on a limited- access highway on the trail of a vehicle which appeared to pose a significant threat to public safety the officers' failure to heed their supervisor does not sink to the level of a constitutional breach. In the last analysis, the signals are mixed the inclement weather, the relatively high speeds, and the overriding of a departmental regulation are troubling, but these facts are ameliorated because the chase was brief (under five minutes), it took place on a six-lane, limited-access highway, and turning a blind eye would have left the public in jeopardy and mixed signals are not the stuff from which a finding that particular conduct shocks the conscience can easily be derived. 9 We need go no further.4 Even though we acknowledge the imprecision of the "shock the conscience" test, see Evans, 100 ___ _____ F.3d at 1039, the officers' conduct here is more reasonable than that displayed in several cases in which appellate courts understandably have held police behavior not to traverse the constitutional line. See, e.g., Fagan v. City of Vineland, 22 ___ ____ _____ _________________ F.3d 1296, 1299-1300 (3d Cir. 1994) (en banc) (involving a pursuit at up to 80 m.p.h. through many red lights); Temkin, 945 ______ F.2d at 718 (involving a pursuit at speeds up to 105 m.p.h. on a narrow, two-lane highway). Because we agree with the decisions in those cases, we also agree, a fortiori, that the court below correctly decided the case at bar. Affirmed. Affirmed. ________  ____________________ 4Of course, our holding today does not mean that injured parties are necessarily remediless in these situations; state law provides an avenue for recourse (although perhaps a less generous one). However, exploring that avenue is beyond the legitimate scope of this opinion. 10