Neil HOWARD, Heidi Howard, Christopher Howard, Ethan Howard, Jessica Howard, and Neil Howard and Heidi Howard as executors of the Estate of Faith Howard, Plaintiffs,

v.

Barbara MALAC, Paige Haley, Judy Beland, Mary Ellen D'Intino, Cynthia Preston, Elizabeth Czarnionka, Katherine Graves, Nancy Gingras, Zevorah Bagni, and Margaret Hajjar, Defendants.

No. CIV.A. 02–12106–WGY.

United States District Court,
D. Massachusetts.

July 1, 2003.

Gregory A. Hession, Belchertown, MA, for Christopher Howard, Ethan Howard, Faith Howard, Heidi Howard, Jessica Howard, Neil Howard.

Michelle A. Kaczynski, Attorney General's Office, Boston, MA, for Veronica Serrato, Barbara Boustani, Joseph Trainor, Barbara Malac, Anne Dale, Cynthia Preston, Elizabeth Czamionka, Judy Beland, Katherine Graves, Mary Ellen D'Intino, Nancy Gingras, Paige Haley, Zevorah Bagni, Felicia Suggs.

Tory A. Weigand, Morrison, Mahoney, & Miller LLP, Boston, MA, for Margaret Hajjar.

## MEMORANDUM AND ORDER

YOUNG, Chief Judge.

The instant case involves a family's allegations against a host of defendants, including numerous Department of Social Service ("DSS") agents, a visiting nurse, and a foster mother. The allegations stem from DSS's filing of a number of child abuse reports against the parents, the subsequent investigations and hearings on these abuse charges, the alleged abuse of one of the children by a foster mother into whose care he was placed by DSS, and the alleged cover-up of that abuse by DSS agents and the foster mother.

Three of the defendants in this case—foster mother Barbara Malac ("Malac"), DSS investigator Cynthia Preston ("Agent Preston"), and DSS investigator Nancy Gingras ("Agent Gingras")—here move to dismiss pursuant to Federal Rule of Civil

Procedure 12(b)(6) for failure to state a claim.

## I. INTRODUCTION

### A. Facts

As this is a motion to dismiss, the following facts are drawn from the plaintiffs' complaint. Particular attention is given to the allegations against Malac, Agent Preston, and Agent Gingras, who have filed the instant motions to dismiss.

On August 17, 1999, plaintiff Heidi Howard ("Heidi") gave birth to plaintiff Faith Howard ("Faith"), who was born with a severe neurological disorder. Third Am. Compl. [Docket No. 56] ¶ 18. Faith was the third child born to Heidi and her husband, the plaintiff Neil Howard ("Neil"); they already had two sons, the plaintiffs Christopher Howard ("Christopher") and Ethan Howard ("Ethan") (collectively, the "Plaintiffs").

After Faith's birth, a social worker at Spaulding Rehabilitative Hospital began to speak with one or more DSS agents. *Id.* ¶ 19. The Plaintiffs claim that at this time, there was no suspicion of abuse in the family. *Id.*

On October 28, 1999, DSS sent a visiting nurse, Defendant Margaret Hajjar ("Hajjar"), to the Howard home under what the Plaintiffs describe as "the pretext of helping Heidi prepare for the homecoming of her handicapped daughter," Faith. *Id.* ¶ 20. Hajjar subsequently phoned a report to DSS describing the conditions of the Howard home. *Id.* ¶ 22. As a result of this report, which the Plaintiffs allege was false, DSS generated a report of child abuse or neglect against the Howards on that same day. *Id.* ¶ 23.

The Defendant Mary Ellen D'Intino ("Agent D'Intino"), a DSS investigator, then followed up on these allegations. *Id.* ¶ 67. The Plaintiffs claim that Agent D'In-tino subsequently "forced" Heidi to obtain a restraining order against Neil. *Id.* ¶ 72. According to the Plaintiffs, Agent D'Intino demanded that Heidi perjure herself by making false allegations of abuse against Neil, threatening that if Heidi did not do so, she would lose her children. *Id.* ¶ 74. Heidi did so, and a restraining order against Neil was issued on November 4, 1999. *Id.* ¶ 24.

On November 24, 1999, Heidi went to court to get the restraining order vacated. *Id.* ¶ 25. According to the Plaintiffs, the order "was allowed in part and denied in part, leaving the order ambiguous." *Id.* ¶ 25. On November 29, 1999, Defendant DSS Agents Katherine Graves ("Agent Graves") and Elizabeth Czarnionka ("Agent Czarnionka"), respectively a DSS investigator and case worker, twice entered the Howard home without the permission of Neil or Heidi. *Id.* ¶ 26. That same day, they took the two other Howard children—Christopher and Ethan—from the Howard home, sent Heidi to get a psychological evaluation, and arrested Neil for violating the restraining order. *Id.* ¶ 27.

On December 1 and 13, 1999, Agent Graves and Agent Czarnionka filed what the Plaintiffs describe as "false affidavits alleging that Neil and Heidi were abusive and neglectful, and that Faith was in danger as she was to be moved to an unsecured facility." *Id.* ¶ 28. On December 8, Agent Czarnionka allegedly communicated to Heidi, through a hospital social worker, that she would never see her children again if she did not reinstate the restraining order. *Id.* ¶ 29. Heidi thus went back to court and reapplied for a restraining order. *Id.* ¶ 30.

On December 13, 1999, Heidi was moved from the psychiatric unit at Emerson hospital to Middlesex Juvenile Court for a hearing to determine whether Christopher

and Ethan would remain in DSS custody. *Id.* ¶ 31. Neil also attended the hearing. *Id.* At the hearing, Agent Graves and Agent Czarnionka allegedly "coerced" Heidi to sign a waiver of the hearing regarding DSS's right to keep custody of Christopher and Ethan, and to tell the judge that she wanted to add Faith to the petition. *Id.* ¶ 32. They also falsely told her that Neil was going to sign the waiver; meanwhile, they told Neil that he should sign because Heidi was going to sign. *Id.* ¶¶ 33, 35. Neil and Heidi ended up waiving their custody rights, allegedly without a colloquy by the judge to determine whether this waiver was knowing and voluntary. *Id.* ¶ 36.

Faith, who was terminally ill, subsequently died. *Id.* ¶ 126. Christopher and Ethan remained in DSS custody and were placed in foster care, with Ethan being placed in the care of Malac. *Id.* ¶ 45.

On December 24, 1999, Heidi dropped the restraining order against Neil for good. *Id.* ¶ 37. Over the course of the following year, Heidi and Neil apparently pursued various hearings and proceedings to get visitation with their children and to regain custody of their children; simultaneously, the DSS made various findings of abuse and neglect against them. Throughout this time, the Howards allege that Malac, Ethan's foster mother, physically abused Ethan. They state that she repeatedly injured him, by breaking his arm, holding his head under water, bruising him, and then attempting to hide his wounds with makeup. *Id.* ¶ 46. They further allege that DSS case workers Paige Haley ("Agent Haley") and Judy Beland ("Agent Beland"), both of whom are defendants in this case, knew of this abuse and colluded with Malac to cover it up. *Id.* ¶¶ 55, 62. In addition, the Plaintiffs allege that Malac, in collusion with Agents Haley, Beland, and Preston, repeatedly filed false

reports of child abuse or neglect about Neil and Heidi immediately before the hearings that they had instigated to obtain additional visitation and regain custody. *Id.* ¶¶ 48–49, 52–56, 59–64, 77–82.

Specifically with respect to Agent Preston, who has filed one of the instant motions to dismiss, the Plaintiffs allege that she (1) failed to give a written statement to Heidi and Neil of their rights when she investigated a January 26, 2000 report of abuse that Malac had filed against them; (2) submitted a report of her investigation that contained a substantial misrepresentation of a February 3, 2000 videotaped interview with Christopher; and (3) supported a finding of neglect against Neil and Heidi due to Heidi's breast feeding of Ethan, who was three years old at the time, resulting in the DSS's decision to decrease visitation between the children and parents from weekly to monthly. *Id.* ¶¶ 77–81.

On October 22, 2000, Agent Gingras, who has also filed one of the instant motions to dismiss, made a finding of abuse against Neil and Heidi. *Id.* ¶ 106. According to Neil and Heidi, in conducting the investigation that resulted in that finding, Agent Gingras did not interview the "child or the source of the complaint." *Id.* ¶ 108. Pursuant to her October 22, 2000 finding of abuse against Neil and Heidi, Agent Gingras then placed Neil and Heidi on the Massachusetts Registry of Alleged Perpetrators. *Id.* ¶ 106. Neil and Heidi allege that Agent Gingras did not provide them with written notice that they were being placed on this Registry and that they never received a written notification of their rights. *Id.* ¶¶ 106, 109.

On December 14, 2000, Heidi gave birth to a daughter, Jessica. *Id.* ¶ 38. Allegedly without any allegations of abuse or neglect concerning Jessica, DSS requested a petition for care and protection, which was

granted without an evidentiary hearing. *Id.* ¶ 39. Jessica was thus taken into DSS custody.

On April 11, 2001, a trial began in the Middlesex Juvenile Court regarding whether DSS could terminate the Howards' parental rights and whether the three living Howard children (Ethan, Christopher, and Jessica) were in need of care and protection. *Id.* ¶ 40. The trial continued for several days. *Id.* It ultimately concluded with a return of the children to the Howard parents, although it is not clear when this happened. The Plaintiffs state that just before Malac was to be called as a witness, the DSS halted the case, worked out an arrangement to send Jessica home, and agreed to negotiate later to send Christopher and Ethan home. *Id.* ¶ 41. DSS never rested, the parents never put on a case, and all three children are now at home with the Howards. *Id.* ¶¶ 41–42.

## B. Procedural Posture

Having originally filed this action on October 28, 2002, the Plaintiffs filed their Third Amended Complaint on May 2, 2003. In their Third Amended Complaint, the Plaintiffs brought a claim under 42 U.S.C. § 1983 against each of the ten above-named defendants. Defendant Malac moved to dismiss [Docket No. 47], as did Defendants Agent Preston and Agent Gingras [Docket No. 50]. On May 29, 2003, this Court held a hearing on these motions; at the conclusion of that hearing, it took the matter under advisement.

## C. Standard of Review

In ruling on a motion to dismiss, the Court construes the complaint in the light most favorable to the plaintiff; dismissal is appropriate only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The Court must take the well-pleaded facts as they appear in the complaint, extending the plaintiffs every reasonable inference in their favor. *Correa–Martinez v. Arrillaga–Belendez,* 903 F.2d 49, 51 (1st Cir.1990).

## II. DISCUSSION

As noted above, all of the Plaintiffs' claims against the various defendants (including Agent Preston, Agent Gingras, and Malac) arise under Section 1983. To prevail in an action brought under Section 1983, a plaintiff must show that she "was deprived of a right, immunity, or privilege secured by the constitution or laws of the United States by a person acting under color of state law." *See, e.g., Pittsley v. Warish,* 927 F.2d 3, 6 (1st Cir.1991). The Section 1983 claims against the three defendants who move to dismiss—foster mother Malac, and DSS agents Preston and Gingras—all arise out of the Due Process clause.

Section 1983 claims under the Due Process clause may take either of two forms: substantive due process claims or procedural due process claims. Within the substantive due process model, there are two types of claims: (1) those in which a plaintiff "demonstrate[s] a violation of an identified liberty or property interest protected by the due process clause"; and (2) those in which the plaintiff does not "prove a violation of a specific liberty or property interest," but rather shows that "the state's conduct is such that it 'shocks the conscience.'" *Id.* at 6. A procedural due process claim, on the other hand, alleges that the state failed to meet the requirement that "before a significant deprivation of liberty or property takes place at the state's hands, the affected individual must be forewarned and afforded an opportunity

to be heard at a meaningful time and in a meaningful manner." *Amsden v. Moran*, 904 F.2d 748, 753 (1st Cir.1990) (internal quotation marks omitted).

■■■ At the outset, it is helpful to note that two identified liberty interests—protected by substantive due process—are implicated in this case with respect to Agent Preston, Agent Gingras, and Malac. First, parents have a protected interest in the care, custody, and management of their children; children have a correlative liberty interest in being in the care and custody of their parents. *See, e.g., Suboh v. Dist. Attorney's Office*, 298 F.3d 81, 91 (1st Cir. 2002). One aspect of this right is that "a case worker must have no less than a reasonable suspicion of child abuse (or imminent danger of abuse) before taking a child into custody prior to a hearing"; a "parent's right to the care, custody, and control of a minor child is inviolate unless a case worker has such a suspicion." *Hatch v. Dep't for Children, Youth, and Their Families*, 274 F.3d 12, 22–23 (1st Cir.2001). Second, children taken into state custody have the right not to be placed by the state with foster parents having a known propensity to neglect or abuse children. *See, e.g., Southerland v. Giuliani*, 4 Fed.Appx. 33, 37 (2d Cir.2001) (unpublished opinion)[1] ("It is well-established that a child in foster care has a liberty interest to be free from harm, and correspondingly, that the state has a duty to protect such children from harm."); *K.H. v. Morgan*, 914 F.2d 846, 852 (7th Cir.1990).

With those two substantive liberty interests in mind, the Court turns to each defendant's motion to dismiss, highlighting the specific constitutional violation(s) alleged with respect to each.

## A. Agent Preston's Motion To Dismiss

■■ The Plaintiffs' Section 1983 claim against DSS Agent Preston rests on the allegations that she did not give Neil and Heidi a written statement of their rights when investigating Malac's report that they had abused their children and subsequently filed a child abuse report against them in which she included fabricated material and misrepresented the contents of a videotaped interview with Christopher. The Plaintiffs claim that Agent Preston's actions infringed their substantive due process right to direct the care and upbringing of their child. Third Am. Compl. ¶ 82. As noted above, this is a well-established right, the infringement of which clearly violates substantive due process.

Preston moves to dismiss on grounds that these allegations, even taken as true, do not rise to the level of a substantive due process violation. The allegation that Agent Preston knowingly filed a report against Neil and Heidi that included a large amount of false material does, however, set forth a substantive due process violation. It is true that "[t]he right to family integrity clearly does not include a constitutional right to be free from child abuse investigations." *Watterson v. Page*, 987 F.2d 1, 8 (1st Cir.1993). As noted above, however, the case law indicates that

---

1. For the propriety of citing this unpublished Second Circuit opinion, see *Anastasoff v. United States*, 223 F.3d 898, 899–905 (8th Cir.2000) (Arnold, J.) (holding that unpublished opinions have precedential effect), *vacated as moot*, 235 F.3d 1054 (8th Cir.2000) (en banc), *Giese v. Pierce Chem. Co.*, 43 F.Supp.2d 98, 103 (D.Mass.1999) (relying on unpublished opinions' persuasive authority), and Richard S. Arnold, *Unpublished Opinions: A Comment*, 1 J.App. Prac. & Process 219 (1999). *See also* Richard L. Neumeier, *Ethics of Appellate Advocacy: Unpublished Opinions* (Oct.2001) (unpublished seminar paper, on file with author).

the right to family integrity encompasses the requirement that a finding of child abuse, justifying the removal of a child from his parent, must be based upon reasonable suspicion. *See, e.g., Hatch,* 274 F.3d at 21–22. Taking all intendments in the Plaintiffs' favor, the clear implication of their charge that Agent Preston fabricated significant aspects of her report against Neil and Heidi is that Agent Preston did not, in fact, reasonably suspect them of abuse.

Of course, unlike in *Hatch,* here the children had already been removed from their parents when Agent Preston submitted the allegedly false report. Nonetheless, Agent Preston's submission of this report contributed to the continued separation of Christopher and Ethan from Neil and Heidi. Her filing of the report allegedly resulted in a DSS decision to reduce Neil and Heidi's visits with their sons from once a week to once a month and, presumably, impeded their efforts to regain custody. The Court thus considers these allegations to fall within the scope of the substantive due process right articulated in *Hatch.* As such, taking all intendments in the Plaintiffs' favor, their Complaint does state a Section 1983 claim against Agent Preston pursuant to a substantive due process theory, and her motion to dismiss is therefore denied.

**B. Agent Gingras's Motion to Dismiss**

■ The Plaintiffs' Section 1983 claim against Agent Gingras arises from (1) her investigation of them that resulted in her October 22, 2000 finding of abuse against them, and (2) her placement of them—pursuant to that finding—on the Massachusetts Registry of Alleged Perpetrators. The Plaintiffs claim that Agent Gingras failed to "investigate the claim properly according to law and regulations" and that

she violated DSS regulations by not providing Neil and Heidi with written notice of their placement on the Registry. They claim that Agent Gingras therefore violated their substantive due process right to the care and custody of their children, and their procedural due process rights to fair and impartial court proceedings. Third Am. Compl. ¶ 110.

The Court begins with the Plaintiffs' allegations regarding Agent Gingras's allegedly deficient investigation of Neil and Heidi, resulting in her filing of an abuse report against them. The filing of an abuse report justifying the removal (or, presumably, continued separation) of a child from his parents does implicate the protected liberty interest in family integrity, *see, e.g., Hatch,* 274 F.3d at 22–23, such that procedural due process rights attach. Here, however, the Plaintiffs' allegations do not state a procedural due process violation. The First Circuit has explained that the availability of adequate state post-deprivation remedies resolves any procedural due process concerns. *See, e.g., Herwins v. City of Revere,* 163 F.3d 15, 19 (1st Cir.1998) ("[T]here is no denial of *procedural* due process, even by the official, so long as the state provides an adequate means of redress. The Supreme Court has held this both where the official's action is negligent, and where it is deliberate.... Assuming that the state remedies are themselves adequate, it has seemed sufficient to leave such random and individual errors to be corrected by state courts and agencies.") (internal citations and quotation marks omitted). Here, there were indeed such state remedies. Under Massachusetts law, parents can appeal abuse reports filed against them before a Hearing Officer, the Superior Court, the Appeals Court, and ultimately the Supreme Judicial Court; they may also seek direct appellate review from the Superior Court to the Supreme Judicial Court. *See,*

e.g., *Cobble v. Dep't of Soc. Servs.*, 430 Mass. 385, 719 N.E.2d 500 (1999); *Arnone v. Comm'r of Dep't of Soc. Servs.*, 43 Mass. App.Ct. 33, 34, 680 N.E.2d 945 (1997). Given the availability of such remedies, no procedural due process violation is implicated here.

Nor did Agent Preston's alleged failure to comply with state procedures in investigating the abuse claims against Neil and Heidi infringe their substantive due process rights. As noted above, substantive due process violations can arise either from the infringement of a protected liberty interest or from behavior that "shocks the conscience." Here, the Plaintiffs' allegations fail to satisfy either category.

In contrast to their allegations against Agent Preston, the Plaintiffs have not charged that Agent Gingras knowingly falsified a report against them. The most that the Plaintiffs' complaint can be read to allege against Agent Gingras is that she did not comply with unspecified "law and regulations" insofar as she did not interview the "child" or the "source of the complaint," and did not give Neil and Heidi "a written notification of their rights." Compl. ¶¶ 108–09. Even assuming *arguendo* that Agent Gingras did fail to comply with applicable DSS regulations or state law, however, it does not follow that she infringed the Plaintiffs' constitutionally protected substantive due process rights. *See, e.g., Boveri v. Town of Saugus*, 113 F.3d 4, 7 (1st Cir.1997) ("A regulatory violation, like a violation of state law, is not inherently sufficient to support a § 1983 claim."); *Martinez v. Colon*, 54 F.3d 980, 989 (1st Cir.1995) ("It is established beyond peradventure that a state actor's failure to observe a duty imposed by state law, standing alone, is not a sufficient foundation on which to erect a section 1983 claim."). As explained above, a showing that Agent Gingras violated the Plaintiffs' constitutionally protected substantive due process right to family integrity would require allegations indicating that Agent Gingras entered a finding of abuse without a reasonable suspicion of such abuse. The Plaintiffs, in claiming only that Agent Gingras did not comply with state procedures, have not alleged this.

Nor do the Plaintiffs' allegations about Agent Gingras's allegedly deficient investigation shock the conscience. As delineated by the First Circuit, the "conscience-shocking" requirement is extremely stringent. The First Circuit noted in *Cummings v. McIntire* that:

> [v]arious formulations have been used to identify conduct sufficiently outrageous to meet that standard, which deliberately was set high to protect the Constitution from demotion to merely "a font of tort law." Courts have held that the acts must be such as to offend even hardened sensibilities, uncivilized and intolerable, offensive to human dignity, or must constitute force that is brutal, inhumane, or vicious.

271 F.3d 341, 344 (1st Cir.2001) (Coffin, J.) (internal quotation marks and citations omitted); *see also Cruz–Erazo v. Rivera–Montanez*, 212 F.3d 617, 622–24 (1st Cir. 2000) (holding that plaintiffs' allegations that police officers moved into plaintiffs' unoccupied house without their consent, broke the new locks that the plaintiffs put on their house, filed unsupported charges against the plaintiffs, perjured themselves in testifying against the plaintiffs, and threatened physical violence against them did not sufficiently shock the conscience so as to violate substantive due process). The Plaintiffs' allegations that Agent Gingras did not comply with appropriate procedures in investigating the allegations of abuse against them manifestly do not rise to this level.

■ Having concluded that the Plaintiffs' allegations about Agent Gingras's deficient investigation of them do not adequately support a Section 1983 claim on either procedural or substantive due process grounds, the Court now considers whether their allegations about her placement of Neil and Heidi on the Registry of Alleged Perpetrators can suffice. Unfortunately for the Plaintiffs, the central flaw in this allegation—for both substantive and procedural due process purposes—is that they have not identified a recognized liberty interest implicated by the placement of Neil and Heidi on this Registry.

Even if the Plaintiffs are correct that Agent Gingras, in failing to provide Neil and Heidi with notice of their placement on the Registry, violated DSS regulations,[2] that alone does not give rise to a substantive due process violation. As noted above, violations of state law or regulations do not, themselves, amount to infringements of substantive due process interests.

Rather, the Plaintiffs must either show that a recognized liberty interest was implicated here or that Agent Gingras's actions shocked the conscience.

The scant case law that exists on this subject indicates that no protected liberty interest was implicated by Neil and Heidi's placement on the Registry, particularly given the absence of any allegation that Neil and Heidi's placement on that list imposed a tangible injury, other than stigma, upon them. *See Hodge v. Jones,* 31 F.3d 157, 164–165 (4th Cir.1994) (holding that no constitutional interest was implicated by the placement of plaintiffs on registry of abusers, even though abuse had been officially "ruled out," because the placement did not tangibly affect their rights to family integrity or privacy but only resulted in a "reputational" injury); *Glasford v. New York State Dep't of Soc. Servs.,* 787 F.Supp. 384, 388 (S.D.N.Y. 1992) ("[P]laintiff's relationship with his

---

**2.** An examination of the applicable DSS regulations indicates that such notice is required, although the regulations are not entirely clear on the subject.

Under Massachusetts law, DSS maintains a central registry of all children who have been the subject of a report of abuse or neglect. Mass. Regs.Code tit. 110, § 4.23; Mass. Gen. Laws ch. 119, §§ 51B (6), 51F. A concomitant list for the alleged abusers is also maintained by DSS. Mass. Regs.Code tit. 110, § 4.36 ("The Department [of Social Services] shall ... create and maintain a Registry of Alleged Perpetrators as a component of the Central Registry maintained pursuant to M.G.L. c. 119, § 51F."). Alleged abusers are placed on the Registry of Alleged Perpetrators when the allegation of child abuse or neglect has been supported and referred to the District Attorney and there is substantial evidence (defined as "such evidence as a reasonable mind might accept as adequate to support a conclusion") of the perpetrator's guilt. Mass. Regs.Code tit. 110, § 4.37.

In a separate section, the DSS regulations generally provide that "[w]henever the Department has supported a report of abuse or

neglect of a child, any parent of the subject child, or any caretaker who has been identified in the Department's records as the person believed to be responsible for the abuse or neglect, ... dissatisfied with the Department's decision to support the report may have a Fair Hearing Review of that decision." Mass. Regs.Code tit. 110, § 10.06(8). The Massachusetts Appeals Court has referred to this provision as applicable to parties wishing to challenge their placement on the Registry of Alleged Perpetrators. *See Covell v. Dep't of Soc. Servs.,* 54 Mass.App.Ct. 805, 808–809, 768 N.E.2d 564 (Mass.App.Ct.2002) ("Once an individual has been listed in the registry, he may exercise his right to an administrative appeal.") (citing Mass. Regs.Code tit. 110, § 10.06(8)). Presumably, therefore, the regulations' further provision that "[f]ollowing the Department's decision to support a report of abuse or neglect, the Department shall notify the parties involved that they have the right to appeal the support decision via the Fair Hearing Process," Mass. Regs.Code tit. 110, § 10.06(8)(a), also applies to placement on the Registry of Alleged Perpetrators, and thus requires specific notice of that placement.

children was altered not by the entry of his name on the Central Register but by the proceedings in Family Court at which the family court judge found that the plaintiff had abused his children.... Therefore, plaintiff must be contesting only the effect of the report in the Central Register on his reputation. However, [the Supreme Court in] *Paul [v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976),] held that effect on one's reputation, without more, is not a constitutionally protected liberty or property interest."); *cf. Valmonte v. Bane*, 18 F.3d 992, 999–1002 (2d Cir.1994) (ruling that plaintiff who had been placed on state registry of suspected child abusers had sufficiently alleged the deprivation of a protected liberty interest because she had not only shown that the placement resulted in stigma to her, but had also alleged that "she would look for a position in the child care field but for her presence on the Central Register"). Based on these precedents, the Court rejects the view that Neil and Heidi's placement on the Registry implicated a constitutionally protected liberty interest that, if infringed, could give rise to a substantive due process claim.

Of course, the Plaintiffs could also assert a substantive due process violation here pursuant to the "conscience-shocking" theory. Given the extremely high standard in the First Circuit for what rises to the level of "conscience-shocking" behavior, however, they cannot succeed under this theory either. Agent Gingras's failure to notify Neil and Heidi of their placement on the Registry, while regrettable, cannot be considered "uncivilized," "intolerable," or "inhumane." *Cummings*, 271 F.3d at 344.

■ The conclusion that no protected liberty interest was implicated by Agent Gingras's placement of Neil and Heidi on the Registry eviscerates any procedural due process argument as well. Given that

no "significant deprivation of liberty or property" occurred as a result of their placement on this list, no attendant process was constitutionally due. Agent Gingras's failure to comply with state and DSS regulations is entirely beside the procedural due process point. As the *Hodge* court explained:

> [A]s to the Hodges' claims of procedural due process violations, our decision in Section II.A that no protected liberty interest was implicated by Defendants' actions obviates any federal constitutional requirement of procedural due process. The fact that Defendants' acts may have violated various Maryland statutory provisions ... is of no consequence in a § 1983 action, since a State's violation of its own laws or procedural rules, creating rights beyond those guaranteed by the Constitution, cannot support a federal due process claim.

*Hodge*, 31 F.3d at 168 (internal citations omitted).

Accordingly, Agent Gingras's motion to dismiss is granted.

## C. Malac's Motion to Dismiss

■ The Plaintiffs' section 1983 action against Malac arises from her alleged abuse of Ethan and her alleged filing of false reports accusing Neil and Heidi of abusing Ethan. The Plaintiffs claim that these actions violated the following constitutional rights: (1) Ethan's right to be free from bodily harm by a state agent; (2) Neil and Heidi's right to due process at court hearings; and (3) Neil and Heidi's substantive due process right to the custody and care of their son. In the Court's view, the allegations against Malac most directly implicate the first of these rights: the right of a child taken into state custody not to be placed with a foster parent who abuses him. As noted above, this is a recognized, protected liberty interest un-

der the due process clause. *See Southerland,* 4 Fed.Appx. at 37; *K.H.,* 914 F.2d at 852.

With respect to Malac's instant motion to dismiss, the issue is whether Malac, as a foster mother, qualifies as a state actor such that a Section 1983 suit can be brought against her. The factual allegations of this case—that is, the Plaintiffs' allegation that not only did Malac abuse Ethan, but that *DSS agents colluded with her* in her abusive behavior—render this an unusually difficult question.

In general, the "state action" doctrine encompasses a number of tests for determining whether a non-governmental entity or official qualifies as a state actor for purposes of Section 1983. In other circuits, the courts applying those tests in specific cases have concluded that foster parents are *not* state actors for purposes of Section 1983. *See, e.g., Rayburn v. Hogue,* 241 F.3d 1341, 1349 (11th Cir.2001) (holding that foster parents are not state actors); *K.H.,* 914 F.2d at 852 ("We may assume, without deciding . . . that the foster parents, even if paid by the state, are not state agents for constitutional purposes"); *Milburn v. Anne Arundel County Dep't of Soc. Servs.,* 871 F.2d 474, 479 (4th Cir.1989) (holding that foster parents are not state actors).

The Plaintiffs suggest that it is unnecessary even to look to those tests because, under the Massachusetts Tort Claims Act, a foster parent is considered a public employee and thereby (they argue) a state actor. The Massachusetts Tort Claims Act, however, actually states:

> For purposes of this chapter, the term "public employee" shall include an approved or licensed foster caregiver with respect to claims against such caregiver by a child in the temporary custody of care of such caregiver or an adult in the care of such caregiver for injury or

death caused by the conduct of such caregiver; *provided, however, that such conduct was not intentional, or wanton and willful, or grossly negligent.*

Mass. Gen. Laws ch. 258, § 1 (emphasis added).

That final proviso disposes of the Plaintiffs' argument that the Court can simply resolve this issue in their favor by looking to the Massachusetts Tort Claims Act. The statute indicates that when the allegation is that the foster parent caused injury through intentional conduct—which is precisely what the Plaintiffs allege here against Malac—the foster parent is not considered to have acted in her capacity as a public employee, and therefore cannot invoke the protections set forth by the Massachusetts Tort Claims Act (namely, individual immunity and legal representation). Mass. Gen. Laws, ch. 258, §§ 1, 2.

■ Moreover, even putting aside the above limitation, it is not at all clear as a general matter that the Massachusetts Tort Claims Act's inclusion of foster parents as public employee necessarily renders them state actors for the purposes of Section 1983. *See, e.g., Rayburn,* 241 F.3d at 1348 (11th Cir.2001) ("[T]he act of extending governmental tort liability and immunity rules to foster parents does not transform the [foster parents] into State actors.").

As such, the Court must return to the general state action framework for determining when private actors can be sued under Section 1983. The First Circuit has recognized the following specific doctrines under which a private actor can be considered a state actor: (1) the public function doctrine, under which a private entity is deemed a state actor if it is performing an exclusively public function, *Logiodice v. Trustees of Maine Cent. Inst.,* 296 F.3d 22, 26 (1st Cir.2002); (2) the "nexus" doctrine,

under which a private entity is deemed a state actor if the State "has exercised coercive power or has provided such significant encouragement, either overt or covert, that the challenged conduct fairly can be attributed to the State," *Perkins v. Londonderry Basketball Club*, 196 F.3d 13, 19 (1st Cir.1999) (internal citations and quotation marks omitted); (3) the "symbiotic relationship" doctrine, under which a private entity is deemed a state actor if the State "has so far insinuated itself into a position of interdependence with [the private entity] that it must be recognized as a joint participant in the challenged activity," *id.* at 21 (internal citations and quotation marks omitted); and (4) the "entwinement" doctrine, under which a private entity can be classified as a state actor when "it is entwined with governmental policies or when government is entwined in [its] management or control," *Logiodice*, 296 F.3d at 27 (quoting *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001)).

In general, these doctrines yield the result that a foster parent cannot be considered a state actor, as noted above. The wrinkle here, however, arises from the Plaintiffs' allegations that DSS Agents Haley and Beland allegedly knew that Malec was abusing Ethan and colluded with her to cover it up. This allegation renders the Plaintiffs' complaint against Malac qualitatively different from those cases in which foster parents, who are sued for child abuse, have not been held to be state actors.

 As an initial matter, the Court notes that the "public function" and "symbiosis" doctrines are clearly inapplicable to this case. Were they the only doctrines under which a private entity could be deemed a state actor, the Plaintiffs' Section 1983 claim against Malac would fail.

The public function doctrine does not suffice here because the First Circuit has made clear that, under this doctrine, it is not enough for a private entity to be performing a function that is sometimes performed by the government. Rather, the function must be one that is *exclusively* reserved to the state. There is an enumerated list of functions falling into that category: "the administration of elections, the operation of a company town, eminent domain, peremptory challenges in jury selection, and, in at least limited circumstances, the operation of a municipal park." *Perkins*, 196 F.3d at 19. "When a plaintiff ventures outside such narrow confines, she has an uphill climb." *Id.* Here, the Plaintiffs cannot make that climb. The function of foster parenting is not analogous to the operation of an election or town; on the contrary, Massachusetts law makes clear the view that foster parents are providing substitute *parental* care in their *private* homes. *See* Mass. Gen. Laws ch. 28A, § 9 (defining "family foster care" as "*substitute parental care* in a family given in a *private residence* for up to six children under eighteen years of age on a regular, twenty-four-hour-a-day, *residential basis* by anyone other than a relative by blood or marriage") (emphasis added). Accordingly, a foster parent cannot be deemed a state actor pursuant to the public function test.

 The "symbiosis" doctrine is also inapplicable here. The symbiotic relationship inquiry focuses "on the nature of the overall relationship between the State and the private entity." *Perkins*, 196 F.3d at 21. In evaluating that relationship, the question is the extent to which the government has insinuated itself into a position of interdependence with the private entity. *Id.* The First Circuit has explained that the most important factors are: (1) "the extent to which the private entity is (or is

not) independent in the conduct of its day-to-day affairs"; and (2) whether the State has "knowingly shared in the profits spawned by the [private entity's] discriminatory conduct." *Id.* Here, of course, no profits are at issue. Moreover, foster parents are indeed relatively independent in the conduct of their day-to-day affairs. Of course, they are subject to certain regulations, but Massachusetts law emphasizes, as noted above, that they are considered to be private families who are parental substitutes. Accordingly, this Court rejects the view that the state insinuates itself into the daily activities of foster parents to the extent that they are transformed into private actors.

 The "nexus" test and "entwinement" tests, however, are more favorable to the Plaintiffs, because both of them focus specifically on the state's involvement in the challenged conduct at issue. As the First Circuit has explained, the "nexus" inquiry "is a targeted one, with the *challenged conduct* at the hub of the analytical wheel. Thus, the focal point is the connection between the State and the challenged conduct, not the broader relationship between the State and the private entity." *Id.* (emphasis added).

As such, the question is whether the state was connected to Malac's alleged abuse of Ethan and her filing of false reports against Neil and Heidi. Usually, the answer to the question of whether the state is connected to a foster parent's child abuse is a resounding no. *See, e.g., Rayburn,* 241 F.3d at 1348 ("[B]ecause the particular conduct at issue here is child abuse, we must determine whether the state was a 'joint participant' with the [foster parents] in the context of child abuse. The answer is 'no.'") (internal citations omitted). Here, however, when the Court takes all intendments in the Plaintiffs' favor, the answer seems to be yes. As noted

above, the Plaintiffs have specifically alleged that several DSS agents knew that Malac was abusing Ethan and worked with her to cover it up so that she could retain custody of him. This seems to fall directly into the narrow exception in which courts have suggested that a foster parent could be considered a state actor. *See K.H.,* 914 F.2d at 852 ("The only right in question in this case is the right of a child in state custody not to be handed over by state officers to a foster parent or other custodian, private or public, *whom the state knows or suspects to be a child abuser. Only in this case thus narrowly described can the foster parent be fairly considered an instrument of the state for child abuse.*") (emphasis added); *Del. A. v. Roemer,* 777 F.Supp. 1297, 1318 (E.D.La. 1991) ("'[T]he foster parent is deemed a 'state instrument' only if the State places the child in a setting it knows or should have known was unsafe. Outside of this narrow case, foster parents are not agents of the state.").

The entwinement doctrine, like the nexus doctrine, places its focus on the challenged conduct in question. The entwinement doctrine stems most directly from the Supreme Court's recent holding in *Brentwood,* in which the Court stated that a private entity can be considered a state actor when it is "entwined with governmental policies or when government is entwined in its management or control . . . ." 531 U.S. at 296, 121 S.Ct. 924 (internal citations and quotation marks omitted). In *Logiodice,* a post-*Brentwood* case, the First Circuit applied the entwinement test by looking specifically "to the particular activity sought to be classed as state action." 296 F.3d at 28. Under that approach, it again seems that—for the purposes of the instant motion to dismiss—Malac must be deemed a state actor, given the allegations that DSS agents, who are

undeniably state actors, colluded with her in her actions.

When all intendments are taken in the Plaintiffs' favor, therefore, their allegations indicate both that Malac infringed their substantive due process rights and that she can be considered a state actor. Accordingly, Malac's motion to dismiss is denied.

## III. CONCLUSION

For the foregoing reasons, Defendant Barbara Malac's motion to dismiss [Docket No. 47] is DENIED. The motion of Defendant Agent Cynthia Preston and Defendant Agent Nancy Gingras [Docket No. 50] to dismiss is DENIED with respect to Agent Preston, but GRANTED with respect to Agent Gingras.

SO ORDERED.