**Richard H. HATCH, Jr.,**
**Plaintiff, Appellant,**

v.

**DEPARTMENT FOR CHILDREN, YOUTH AND THEIR FAMILIES (State of Rhode Island), Defendant, Appellee,**

**Steven Brown and Mary McKee,**
**Proposed Defendants,**
**Appellees.**

**No. 01–1442.**

United States Court of Appeals, First Circuit.

Heard Nov. 7, 2001.

Decided Dec. 17, 2001.

---

Joseph R. Palumbo, Jr., for appellant.

Linn F. Freedman, Deputy Chief, Civil Division, with whom Sheldon Whitehouse, Attorney General, State of Rhode Island, was on brief, for appellees.

Before SELYA, Circuit Judge, COFFIN, Senior Circuit Judge, and SARIS,* District Judge.

SELYA, Circuit Judge.

This case comes before us following the district court's entry of summary judgment adverse to plaintiff-appellant Richard H. Hatch, Jr., and the court's concomitant refusal to grant leave to amend. On appeal, Hatch challenges only the latter ruling. Concluding, as we do, that amendment would be futile because the qualified immunity of the prospective defendant would render nugatory the proposed amended complaint, we affirm.

## I. BACKGROUND

We divine the following account of the facts from the record below, drawing all reasonable inferences in the appellant's favor.

In the spring of 1997, the appellant inquired about adopting a child. Two months later, he accepted an emergency placement of John Doe, then age seven, at the behest of the Rhode Island Department for Children, Youth and their Families (DCYF). While in the appellant's custody, John exhibited serious behavioral and emotional problems stemming from past abuse—problems that the appellant alleges were known to DCYF at the time

---

* Of the District of Massachusetts, sitting by designation.

of the placement. In particular, John tended to be deceitful and to fly into tantrums (often hurting himself during bouts of uncontrolled rage). Despite these problems, the appellant adopted John in August of 1998.

In the two years following his adoption, John's demeanor improved, and the appellant attributes that improvement to his parenting skills. Then came a chain of events that culminated in John's temporary removal from the appellant's custody. That chain was forged when the appellant left John with a friend for seven weeks to participate in the television show "Survivor." John gained weight during that interval and the appellant, upon his return, decided to institute a fitness regime.

The first step in this initiative occurred at 4:30 a.m. on April 27, 2000, when the appellant directed John to accompany him on a four-or-five-mile run. During this excursion, John began to complain. The appellant responded by declaring that the length of the run would be extended. John then threw a tantrum and the appellant pulled back his arms and jacket to keep him from harming himself. At some point, John fell to the ground and bumped his forehead. After things had quieted down, the appellant took John to school.

At the start of class, John's teacher noticed the bump and questioned John about its origins. John replied that he had fallen on cement. The teacher sent John to the school nurse, who applied an ice pack and inquired about the bump. John repeated the same story. The nurse also observed red marks across John's neck and asked about those as well; John told her that he had scraped himself during the run. Although the nurse doubted this account, she sent the lad back to the classroom with the ice pack and instructions that he report to her at recess.

Within the hour, John's teacher also remarked the red marks on his neck. John told her that he had been scraped by branches during the run. The teacher and the nurse conferred later that morning, and the nurse indicated that she would telephone the appellant to secure his explanation of what had happened. For whatever reason, she did not make the call.

John returned to the nurse at noon with a very different version of the facts. He stated bluntly: "You saw all this stuff that happened to me, my father did it." When asked to amplify, he claimed that, during the run, he could not continue and fell to the pavement as his father pulled him by the earlobe. John further claimed that his father compelled him to do pushups by manipulating his neck and pushing his head into the cement surface. He added that he had been hit in the past and that he was afraid to return home.

Alarmed by this account, the nurse took John to the principal's office. John told the principal what he had told the nurse. The principal then sent John back to class, but telephoned DCYF and related the details of John's statement.

DCYF assigned appellee Steven Brown, an investigator, to follow up on John's allegations of abuse. Brown called the school shortly before 2:30 p.m. and spoke with the principal. She advised Brown that the school was closing soon and expressed fear that the appellant might come for his son before DCYF had a chance to interview the boy. Brown advised the principal to put matters in the hands of the local constabulary pending his (Brown's) arrival.

The principal followed this advice and called the police. The officers responded immediately. John again related his tale of abuse and the officers transported him to the Middletown police station. Brown

arrived at the station at approximately 3:30 p.m. He intended to interview John there, but the boy complained of dizziness and headaches, so Brown arranged for him to be taken to Newport Hospital. John told the rescue personnel essentially the same story that he had told to the nurse, the principal, and the police. The appellant appeared at the police station at about the same time as Brown. He was unceremoniously arrested for felony child abuse.

Meanwhile, Brown had followed John to Newport Hospital. John was seen by an on-call physician, Dr. Altreuter, who found his injuries consistent with his tale of abuse. Dr. Altreuter placed John under a "physician's hold" pending the institution of proceedings before the Family Court. *See* R.I. Gen. Laws § 40–11–5(a) (granting to physicians who encounter injuries consistent with abuse the right, without parental consent, to place an injured child on a seventy-two hour hold pending an adjudicative hearing). The doctor then notified Brown of his action and gave Brown a copy of his report. Brown immediately placed the child under the protective custody of DCYF.[1]

Brown proceeded to interview the boy, heard his account of abuse at first hand, and took photographs of his injuries. Brown also learned of the appellant's involvement in "Survivor," prompting him to call his supervisor, Mary McKee, to warn her that this might prove to be a "high-profile case." He then attempted to interview the appellant—whether before or after he repaired to the courthouse is not clear—but the appellant refused to speak with him on advice of counsel. At the close of his investigation, Brown sought the aid of the Family Court, which issued an ex parte order of temporary custody.

John remained in DCYF's custody pending a further adjudication. On May 24, 2000, the Family Court heard testimony and determined that there was no probable cause to believe that John had been abused. The court therefore concluded that returning home would not place John at risk, rescinded the order granting provisional custody to DCYF, and restored John to the appellant's care.

The matter did not end there. On July 3, 2000, the appellant filed suit against DCYF in the United States District Court for the District of Rhode Island. The complaint sought monetary damages under 42 U.S.C. § 1983 for, inter alia, DCYF's alleged violation of the appellant's constitutional rights to familial integrity and to freedom from undue interference in the care, custody, and control of his child. After the completion of pretrial discovery, DCYF moved for summary judgment on the ground that the Eleventh Amendment protects states (and, therefore, state agencies) from section 1983 liability. Relying on the Supreme Court's decision in *Will v. Michigan Department of State Police*, 491 U.S. 58, 70, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), the district court granted this motion.

The appellant sought to resuscitate his action by moving to amend his complaint, essentially by substituting Brown and McKee as parties defendant. The district court denied the motion to amend as futile, emphasizing that the doctrine of qualified immunity safeguarded the proposed defendants against liability for money damages. This timely appeal followed. In it, the appellant challenges only the district court's denial of leave to file an amended complaint against Brown.

---

**1.** The parties dispute the exact time that DCYF custody attached, but that dispute is not material to our decision. Consequently, we need not resolve it.

## II. STANDARD OF REVIEW

█ As a general rule, we will reverse a district court's decision granting or denying a motion to amend a complaint only for abuse of discretion. *See Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1121 (1st Cir. 1989). We view the court's exercise of discretion in this area of the law through the prism of Federal Rule of Civil Procedure 15(a), which indicates that leave to amend a complaint "shall be freely given when justice so requires." In practice, this means that the denial of such a motion will be upheld so long as the record evinces an arguably adequate basis for the court's decision (e.g., futility, bad faith, undue delay, or a dilatory motive on the movant's part). *Grant v. News Group Boston, Inc.*, 55 F.3d 1, 5 (1st Cir.1995); *Correa–Martinez v. Arrillaga–Belendez*, 903 F.2d 49, 59 (1st Cir.1990).

█ Here, the district court cited the first of these rationales—futility—as the linchpin of its ruling. In the abstract, futility is fully sufficient to justify the denial of a motion to amend. *See Correa–Martinez*, 903 F.2d at 59 ("Where an amendment would be futile or would serve no legitimate purpose, the district court should not needlessly prolong matters."). The question, then, is whether the circumstances of this case justify the court's characterization.

█ Before addressing this question, we pause to identify the yardstick by which futility is to be measured. The appropriateness *vel non* of a district court decision denying a motion to amend on the ground of futility depends, in the first instance, on the posture of the case. If leave to amend is sought before discovery is complete and neither party has moved for summary judgment, the accuracy of the "futility" label is gauged by reference to the liberal criteria of Federal Rule of Civil Procedure 12(b)(6). *See Glassman v.*

*Computervision Corp.*, 90 F.3d 617, 623 (1st Cir.1996). In this situation, amendment is not deemed futile as long as the proposed amended complaint sets forth a general scenario which, if proven, would entitle the plaintiff to relief against the defendant on some cognizable theory. *See Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 421 (6th Cir.2000) (explaining that, in such a posture, "a proposed amendment is futile only if it could not withstand a 12(b)(6) motion to dismiss"). If, however, leave to amend is not sought until after discovery has closed and a summary judgment motion has been docketed, the proposed amendment must be not only theoretically viable but also solidly grounded in the record. *Resolution Trust Corp. v. Gold*, 30 F.3d 251, 253 (1st Cir.1994). In that type of situation, an amendment is properly classified as futile unless the allegations of the proposed amended complaint are supported by substantial evidence. *Id.*

In the case at hand, discovery had closed and DCYF had moved for summary judgment before the appellant filed his motion for leave to amend the complaint. Since the appellant has had the full run of discovery and all the pertinent evidence is in the record—the appellant does not suggest that additional discovery would reveal new facts sufficient to put the case in a different light—we apply the more rigorous "substantial evidence" standard.

## III. ANALYSIS

█ Persons acting under color of state law are liable under 42 U.S.C. § 1983 for infringing on the constitutional rights of private parties. But this liability is not absolute: the doctrine of qualified immunity provides a safe harbor for a wide range of mistaken judgments. *See Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (explaining that

qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law"). Through this doctrine, "the law strives to balance its desire to compensate those whose rights are infringed by state actors with an equally compelling desire to shield public servants from undue interference with the performance of their duties and from threats of liability which, though unfounded, may nevertheless be unbearably disruptive." *Buenrostro v. Collazo*, 973 F.2d 39, 42 (1st Cir.1992).

■ Determining whether qualified immunity is available to a particular defendant at a particular time requires a trifurcated inquiry. We ask, first, whether the plaintiff has alleged the violation of a constitutional right. If so, we then ask whether the contours of the right were sufficiently established at the time of the alleged violation. Finally, we ask whether an objectively reasonable official would have believed that the action taken or omitted violated that right. *Starlight Sugar, Inc. v. Soto*, 253 F.3d 137, 141 (1st Cir.2001). We make these three inquiries in sequence, mindful that a single negative answer suffices to defeat the plaintiff's claim for damages. *Id.*

### A.

■ We start, as the Supreme Court has suggested, with the question of whether the appellant has alleged the violation of a constitutional right.[2] *See Wilson v. Layne*, 526 U.S. 603, 608–09, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999); *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998).

The appellant predicates his claim on what he visualizes as the right to familial integrity and, as a subset of that right, the parental interest in the care, custody, and control of children.

■ At a certain level of generality, this right is plainly of constitutional dimension. The interest of parents in the care, custody, and control of their children is among the most venerable of the liberty interests embedded in the Constitution. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). As such, it is protected by the Due Process Clause. *Id.* at 66, 120 S.Ct. 2054. We must go further, however, because a right cannot be stated at so high a level of generality for the purposes of a qualified immunity inquiry. *See Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

■ In this vein, the law recognizes that the protection afforded to the parents' interest must be balanced against other valid interests, particularly the best interests of the child and the interest of society in the maturation of children as future citizens. *See Frazier v. Bailey*, 957 F.2d 920, 929–30 (1st Cir.1992). Thus, the state may freely investigate allegations of child abuse, *Watterson v. Page*, 987 F.2d 1, 8 (1st Cir.1993), and if, as a result, it develops clear and convincing evidence of parental unfitness, it may move to terminate the relationship between parent and child. *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). As an interim measure, the state may separate the child from the parent, prior to a

---

2. Notwithstanding the Court's sequencing of the relevant inquiries, some circuit courts have held that, under particular circumstances, a court may cut directly to the question of whether the constitutional right was clearly established at the time of the alleged

violation. *E.g., Kalka v. Hawk*, 215 F.3d 90, 96–98 (D.C.Cir.2000); *Horne v. Coughlin*, 191 F.3d 244, 249 (2d Cir.1999). Because we follow the Supreme Court's suggested protocol, we need not consider the propriety of such a deviation here.

hearing, for cause shown.[3] *See Cecere v. City of New York,* 967 F.2d 826, 829 (2d Cir.1992).

▮ The appellant's proposed amended complaint focuses on such a temporary custodial interruption: Brown's decision to take John into state custody prior to obtaining a Family Court order. The Court has not had occasion to formulate the contours of the constitutional rule under which a state official lawfully may take temporary custody of a child during an investigation of abuse or neglect, nor has this court dealt definitively with the issue. Other courts have grappled with it, however, and most of them have concluded that a case worker—we use that term generically—may place a child in temporary custody when he has evidence giving rise to a reasonable and articulable suspicion that the child has been abused or is in imminent peril of abuse. *See, e.g., Brokaw v. Mercer County,* 235 F.3d 1000, 1019 (7th Cir.2000); *Croft v. Westmoreland County Children & Youth Servs.,* 103 F.3d 1123, 1126 (3d Cir.1997); *Gottlieb v. County of Orange,* 84 F.3d 511, 518 (2d Cir.1996); *Manzano v. S.D. Dep't of Soc. Servs.,* 60 F.3d 505, 511 (8th Cir.1995). The justification for such a rule is easily grasped: where a state official has a reasonable basis to suspect abuse, "the interest of the child (as shared by the state as parens patriae) in being removed from that home setting to a safe and neutral environment outweighs the parents' private interest in familial integrity as a matter of law."

*Thomason v. SCAN Volunteer Servs., Inc.,* 85 F.3d 1365, 1373 (8th Cir.1996).

The appellant argues that the Constitution imposes a higher standard on the state. He would have us adopt the minority view, espoused on the appellate level only by one court, which requires that prior to assuming temporary custody, a case worker have "reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury." *Wallis v. Spencer,* 202 F.3d 1126, 1138 (9th Cir. 2000). This rule borders on an obligatory showing of probable cause (or something fairly close to probable cause). Equally as important, the Ninth Circuit has required case workers, as an adjunct to this showing, first to exhaust all "reasonable avenues of investigation." *Id.*

▮ We think that this sets the bar too high, and that the majority rule better balances the competing interests of the child, the parents, and the state. Because the welfare of the child is paramount, an objectively reasonable suspicion of abuse justifies protective measures. *See Lossman v. Pekarske,* 707 F.2d 288, 291 (7th Cir.1983) ("When a child's safety is threatened, that is justification enough for action first and hearing afterward."). Indeed, evidence of even a single instance of abuse may constitute an exigent circumstance sufficient to warrant immediate state action on a child's behalf. *See Jordan v. Jackson,* 15 F.3d 333, 350 (4th Cir.1994) (holding that, in such circumstances, the

---

3. Once the state takes temporary custody of a child, it must follow procedures adequate to justify that detention. *See Jordan v. Jackson,* 15 F.3d 333, 345–46 (4th Cir.1994). This process often takes the form—as here—of an ex parte order of temporary custody, followed by a hearing on the merits of the allegations of abuse. *E.g., Thomason v. SCAN Volunteer Servs., Inc.,* 85 F.3d 1365, 1369–70 (8th Cir.

1996). In his proposed amended complaint, the appellant charges Brown with both substantive and procedural violations of the Due Process Clause. His arguments on appeal, however, relate only to the former. Accordingly, we deem his procedural due process claims abandoned. *See United States v. Zannino,* 895 F.2d 1, 17 (1st Cir.1990).

interest in familial integrity may be infringed for a short time given "the unthinkable consequence of a premature, erroneous return of a child to the custody of parents in whose custody the child's life might be in imminent danger").

■ Moreover, the government has a compelling interest in safeguarding children that it suspects are victims of abuse and in acting quickly on their behalf. We live in an era in which case workers operate under enormous pressure, confronted with the necessity of making on-the-spot judgments on the basis of limited and often conflicting information. Circumstances frequently force them to make difficult choices without time for extensive investigation. When presented with evidence of apparent child abuse, a case worker must have a fair amount of leeway to act in the interest of an imperilled child—and it is better to err on the side of caution than to do nothing and await incontrovertible proof. Given these realities, the existence of a reasonable suspicion of child abuse warrants protecting the child by taking him or her into custody—subject, of course, to appropriate procedural safeguards, *see supra* note 3—while investigating further. *See Wilkinson ex rel. Wilkinson v. Russell*, 182 F.3d 89, 105 (2d Cir.1999).

■ That settles the matter. We reject the appellant's view that a case worker, even after he has a reasonable suspicion of child abuse, must conduct a full-blown investigation and elevate that suspicion to the level of probable cause before assuming temporary custody. We hold instead that the Constitution allows a case worker to take temporary custody of a child, without a hearing, when the case worker has a reasonable suspicion that child abuse has occurred (or, alternatively, that a threat of abuse is imminent). It follows, therefore, that a parent's right to the care, custody, and control of a minor child is inviolate unless a case worker has such a suspicion. In this instance, the appellant's complaint (though it unsuccessfully espouses a broader statement) sufficiently identifies this clearly established constitutional right. Thus, the appellant satisfies the first prong of the tripartite test.

### B.

■ We now must determine whether the contours of the constitutional right that we have identified—a parent's right to custody in the absence of a case worker's reasonable suspicion of child abuse—were clearly established at the time of the critical events. *Buenrostro*, 973 F.2d at 42. The appellant contends that the right here was sufficiently defined at the time of Brown's actions. Brown disagrees, maintaining that our previous decisions, *e.g.*, *Watterson*, 987 F.2d at 8; *Frazier*, 957 F.2d at 930–31, highlight the amorphous nature of the constitutional interest involved and thus compel the conclusion that the contours of the right were not clearly established.

■ The critical inquiry here is whether the dimensions of the right were sufficiently well-defined that a reasonable official would have understood that his actions violated that right. *Anderson*, 483 U.S. at 640, 107 S.Ct. 3034. This does not mean that a court must already have outlawed similar conduct; the test is satisfied if, viewed in the light of preexisting jurisprudence, the unlawfulness of the conduct is apparent. *Id.* We emphasize that this test is time-sensitive. Unless the law was clearly established at the time when an official acted, he "could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Har-*

*low v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Absent such notice, the official is excused from liability for money damages under the doctrine of qualified immunity. *Anderson,* 483 U.S. at 646, 107 S.Ct. 3034. If such notice exists, however, the inquiry proceeds.

■ To determine the contours of a particular right at a given point in time, an inquiring court must look not only to Supreme Court precedent but to all available case law. *See United States v. Lanier,* 520 U.S. 259, 268–69, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997); *Buckley v. Rogerson,* 133 F.3d 1125, 1129 (8th Cir.1998). The Court has not yet spoken to the propriety *vel non* of the reasonable suspicion standard. Our own precedents are likewise inconclusive both as to the correctness of the standard and as to when (or under what circumstances) an officer's belief that a child has been abused justifies him in taking temporary custody without a hearing. The closest of our cases is *DeCosta v. Chabot,* 59 F.3d 279 (1st Cir.1995) (per curiam). There, parents brought suit against a social worker charging a violation of their right to familial integrity during her investigation of possible child abuse. *Id.* at 280. We held that the social worker enjoyed qualified immunity, noting that she had acted on the grandmother's statements about ongoing abuse—statements later corroborated by the children themselves. *Id.* at 280–81. This is consistent with the "reasonable suspicion" standard, but the *DeCosta* court neither articulated a general legal rule governing such cases nor discussed the circumstances under which a state actor might take temporary custody of a child while probing charges of abuse.

In *Frazier,* we upheld a grant of qualified immunity to social workers who had played a role in a family dispute. In so doing, we stated that a father's right to the care, custody, and control of his children "can rarely be considered 'clearly established' ... in the absence of closely corresponding factual and legal precedent." *Frazier,* 957 F.2d at 931 (citation omitted). But *Frazier* did not involve a situation in which a child was taken into temporary custody prior to a hearing, and we were careful to refrain from pronouncing any rule applicable to that specific circumstance. So too *Watterson,* 987 F.2d at 8, in which we held simply that a case worker is not liable for violating the right to familial integrity merely because he conducts a child abuse investigation.

■ Several years elapsed between the dates on which *Frazier* and *Watterson* were decided and the date on which Brown took temporary custody of the appellant's son. During that interval, an emerging body of decisional law outside our own circuit has shed a brighter light on the contours of the constitutional right asserted by the appellant. Although our sister circuits have reached different conclusions on the constitutional standard to be applied when a state actor takes a child into temporary custody, those decisions share a common denominator: at an irreducible minimum, a case worker must have no less than a reasonable suspicion of child abuse (or imminent danger of abuse) before taking a child into custody prior to a hearing. *See Brokaw,* 235 F.3d at 1019; *Croft,* 103 F.3d at 1126; *Thomason,* 85 F.3d at 1373; *Manzano,* 60 F.3d at 511; *see also Mabe v. San Bernardino County,* 237 F.3d 1101, 1106–09 (9th Cir.2001) (elevating the suspicion needed to a level akin to probable cause); *Wallis,* 202 F.3d at 1138 (adding the requirement that case workers pursue reasonable avenues of investigation before depriving parents of custody). Recent district court decisions have hewed to the same line. *E.g., Strail v. DCYF,* 62

F.Supp.2d 519, 530 (D.R.I.1999); *Hebein ex. rel. Berman v. Young*, 37 F.Supp.2d 1035, 1044 (N.D.Ill.1998). Given the widespread agreement that has developed as to the applicable legal regime, we conclude that, in the spring of 2000, an objectively reasonable case worker surely would have believed that taking temporary custody of a child prior to a hearing would violate the parents' interest in the child's care, custody, and control if he acted without a reasonable suspicion of child abuse (actual or imminent). That conclusion has important implications for this case: since clearly established law gave reasonable warning to Brown that he risked liability for violating the appellant's constitutional rights if he took custody of John without a reasonable basis for his suspicions of child abuse, the appellant has survived the second step of our inquiry.

### C.

■ While the first two steps in the qualified immunity pavane deal with abstract legal principles, the final step deals with the facts of the particular case. The question here is whether Brown had reliable information, sufficient to support a reasonable suspicion of abuse, when he removed John from his father's custody.

■ In answering this question, it is important to understand the parameters of the qualified immunity defense. We have written that "the defense of qualified immunity offers sanctuary not only to government officials who act with impeccable propriety, but also to those who err but could not reasonably have understood that their actions infracted a prospective plaintiff's federally assured rights." *Quintero de Quintero v. Aponte-Roque*, 974 F.2d 226, 228 (1st Cir.1992). This means that an official is entitled to qualified immunity as long as "he had an objectively reasonable basis for believing that his conduct would not abridge the rights of others." *Iacobucci v. Boulter*, 193 F.3d 14, 23 (1st Cir.1999). The district court concluded that, taking the facts in the light most hospitable to the appellant's theory of the case, Brown acted on such an objectively reasonable basis. Accordingly, the court deemed the appellant's proposed amended complaint an exercise in futility. We examine that determination.

The appellant argues that Brown acted unreasonably because he did not investigate the matter fully (e.g., obtain the appellant's side of the story, interview John's babysitter, acquaint himself with John's prior inconsistent statements, delve into John's troubled past) before taking temporary custody of John. That argument will not wash. As we have said, if what Brown knew afforded him a reasonable basis for suspecting abuse, he was under no obligation to investigate further before removing the boy from an apparently dangerous situation. *See Robison v. Via*, 821 F.2d 913, 921–22 (2d Cir.1987).

The appellant next argues that Brown lacked a reasonable basis for his suspicions because he relied primarily on hearsay information—an account relayed by the principal (who merely parroted what she had heard that morning from John and the school nurse). Despite the hearsay nature of the principal's statement, we think that Brown had a reasonable basis for suspecting child abuse. We explain briefly.

When he took custody, Brown knew, at the very least, that two responsible faculty members (the principal and the school nurse) took John's claim of abuse seriously; that John had repeated that claim to the police; that he bore marks consistent with his claim; that the boy had expressed fear for his safety should he be forced to return home; that he was complaining of headaches and dizziness; and that a neutral physician, after examining John, had

reported that his injuries were consistent with abuse and had placed him under a "physician's hold." We believe that this was more than sufficient to raise a reasonable suspicion of abuse (and, thus, to justify a temporary assumption of custody).[4]

The fact that the principal's statements were hearsay does not alter this result. Hearsay evidence, if cloaked with indicia of reliability, may establish a reasonable suspicion of unlawful activity in the preliminary stages of an investigation. The Supreme Court elaborated on this point a decade ago:

> Reasonable suspicion ... is dependent upon both the content of information possessed by police and its degree of reliability. Both factors—quantity and quality—are considered in the "totality of the circumstances—the whole picture," that must be taken into account when evaluating whether there is reasonable suspicion. Thus, if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable.

*Alabama v. White*, 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) (citation omitted). The critical question, then, is not whether Brown relied on hearsay, but, rather, whether information possessed by Brown at the time he removed John from the appellant's custody was sufficient to dispel the notion that he acted on a mere hunch. *See id.* at 329–30, 110 S.Ct. 2412.

The hearsay at issue here passes this screen. After all, the principal herself had observed John's injuries and had received material information from him and from the school nurse. Moreover, she provided DCYF with a detailed account of the cir-

cumstances surrounding the supposed abuse and the child's fear of reprisal. Given the authority of the principal and her proximity to the purported victim, the indications of reliability were very strong.

Even more compelling were the statements of Dr. Altreuter. The physician provided Brown with an expert medical opinion that the child had injuries consistent with abuse. (Indeed, the doctor felt constrained to place the child on a seventy-two hour "physician's hold.") Dr. Altreuter's recent examination of John and his expert authority in medicine are powerful indicators of reliability, and his statements substantiated the conclusion that John had been abused that morning.

To say more would be to paint the lily. We hold that the information known to Brown when he took temporary custody of John met both the qualitative and quantitative requirements of the reasonable suspicion standard. *See Thomason*, 85 F.3d at 1371; *Robison*, 821 F.2d at 922. Consequently, the appellant falters at the third step of the qualified immunity inquiry.

## IV. CONCLUSION

We need go no further. The record shows that Brown had a reasonable basis both for suspecting child abuse and for believing John to be in danger (and, therefore, that he acted justifiably in taking the boy into temporary custody). The fact that this suspicion proved, in the long run, to be unfounded does not strip Brown of his entitlement to qualified immunity in regard to a claim for damages. *See Malley*, 475 U.S. at 341, 106 S.Ct. 1092 (emphasizing that the qualified immunity standard protects many mistaken judgments); *Brennan v. Hendrigan*, 888 F.2d 189, 192

---

4. DCYF hardly can be faulted for retaining custody thereafter, inasmuch as the Family Court, acting on much the same information, issued an ex parte order ratifying John's separation from his father.

(1st Cir.1989) (similar). Hence, the district court supportably characterized the appellant's proposed amended complaint as futile and appropriately denied the motion for leave to amend.

*Affirmed.*