# United States Court of Appeals
## For the First Circuit

No. 03-1641

JASON A. TREMBLAY and RICHARD TREMBLAY,

Plaintiffs, Appellees,

v.

WILLIAM E. MCCLELLAN, Individually and Officially as a Corporal
with the Conway Police Department,

Defendant, Appellant,

DAVID BENNETT, CONWAY POLICE DEPARTMENT, TOWN OF CONWAY,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. James R. Muirhead, U.S. Magistrate Judge]

Before

Boudin, Chief Judge,
Cyr, Senior Circuit Judge,
and Lynch, Circuit Judge.

Donald E. Gardner, with whom Michael A. Ricker and Devine,
Millimet & Branch were on brief, for appellant.
Leslie C. Nixon, with whom Nixon, Raiche, Manning, Casinghino
& Leach was on brief, for appellees.

November 20, 2003

**LYNCH**, <u>Circuit Judge</u>.  Jason Tremblay, age sixteen at the time of the underlying events in this case, and his father, Richard Tremblay, sued the Town of Conway, New Hampshire, its police department, and Captain William McClellan.  The suit asserted violations of Jason's constitutional rights and pendent state law claims arising out of his temporary detention under New Hampshire's protective custody statutes.

That detention occurred when Jason and a friend were picked up by Officer McClellan during the early morning hours of September 12, 1999, while walking along a major road just after 2:00 a.m. smelling of alcohol; the police had been called earlier that Saturday night to break up a nearby underage drinking party.  Jason and his friend were taken to the police station, and, a short time later, Jason was brought home.  He then took a family car without permission, picked up two friends, and drove to Maine.  The trip ended tragically: at approximately 5:00 a.m., Jason, driving at a high speed, lost control of the car and crashed into a tree.  Jason's spine was injured, paralyzing him and leaving him permanently disabled.

The suit claimed that the police, by having picked up Jason and then releasing him, were responsible for Jason's injuries.  The defendants moved for summary judgment on various

grounds. They argued, inter alia, that Officer McClellan[1] was protected by qualified immunity, that there were no constitutional violations or tortious acts, and that there was no basis to hold the town liable. The magistrate judge, sitting by consent, granted summary judgment for the defendants on several state law claims, but denied it as to the federal civil rights claims and the state law claims of negligence and false imprisonment. Officer McClellan appeals the magistrate judge's denial of summary judgment on his qualified immunity defense. We reverse and direct entry of judgment in favor of Officer McClellan.

## I.

On summary judgment, we review the testimony in the light most favorable to the plaintiffs.

Officer McClellan gave the following account in his deposition. At around 11:00 p.m. on the evening of September 11, 1999, Officer McClellan and several other policemen broke up a party in Conway at which numerous underage individuals were consuming alcohol. They detained so many teenagers that a school bus was needed to transport them to the police station. While the officers were in the process of rounding up the partygoers, several juveniles ran away, crossing through a nearby river. The police

---

[1]Originally, Lieutenant David Bennett was also sued, but the parties stipulated to his dismissal as a defendant.

were, as a result, looking for teenagers with wet clothes who had been at the party.

McClellan was returning to the police station after taking home a juvenile girl who had been detained at the party when he spotted two other minors walking along East Main Street in Conway, which is Route 302, a federal highway. These teenagers, who turned out to be Jason Tremblay and Dale Bell, were approximately three miles away from the site of the earlier party. Officer McClellan had previously arrested Dale three different times, twice for the possession of alcohol. When McClellan slowed down his police car to get a closer look, he observed that Dale was wearing pants that were wet halfway up his calf. His shoes were also wet. Suspecting that these two teenagers were among those who had run through the river after the earlier party, Officer McClellan stopped his car to speak with them. As he approached them, he detected an odor of alcohol "amongst them" and noticed that Dale's eyes were blood-shot and glassy. He asked the boys whether they had attended the party and whether they had drunk any alcohol that evening.

Officer McClellan said that both teenagers denied either going to the party or drinking alcohol that night. McClellan believed that Dale was lying, but was not sure about Jason, who showed no outward signs of intoxication and whose pants did not appear wet. He told both minors to get into the backseat of the

-4-

police car. He then called in to the police station and reported that he had picked up two boys and that "One is 10-59." The evidence was that this was a code for either drinking or intoxication.[2] Neither Dale nor Jason had any alcohol on him at the time.

When asked what danger to the boys justified picking them up, McClellan stated: "Late at night, walking along the side of the road having consumed alcohol, [they] could get hit by a car. Lots of things happen at nighttime."

It is what Officer McClellan knew at the time of the detention that is important for the detention claim. We describe the later events because they are relevant to the negligent release claims and for their corroborative effect on his testimony as to both claims. As Officer McClellan began to drive away with Jason and Dale, two other teenagers, Michael Palughi and an unidentified girl, approached the police car on bicycles. They claimed that they had spent the evening with Jason and Dale and that the four of them had neither been to the party nor consumed alcohol that night. Given the evidence of alcohol consumption, Officer McClellan believed that they were trying to cover for their friends Dale and

_____

[2]At oral argument, counsel for the plaintiffs argued that Officer McClellan's report that Dale was "10-59" supported the inference that Dale was drinking, but not intoxicated. If Dale were really intoxicated, counsel argued, then Officer McClellan would have specifically noted that fact. The code used encompassed both drinking and intoxication.

Jason, and he continued toward the police station.  During the ride Dale was belligerent and kept insisting that the two of them had not been drinking that evening and that Officer McClellan should have also arrested Michael and the girl.

Officer McClellan arrived at the police station with the two boys at 2:04 a.m.  He entered their two names in the juvenile detention log with the notation "PC," for protective custody,[3] and again asked the two whether they had been drinking alcohol that evening.  Jason continued to deny having consumed any alcohol.  Officer McClellan then asked another officer, who was walking through the booking room, whether she could smell any alcohol on either of the minors.  That officer said that she did smell alcohol on Dale.  She also said that she did not smell any alcohol on Jason, but that the whole room smelled of alcohol.  At this point, Officer McClellan determined that he did not have sufficient evidence that Jason had been drinking to keep him, although the officer still smelled alcohol on them.

---

[3]The applicable New Hampshire statute provides that:
Nothing in this chapter shall be construed as forbidding any police officer from immediately taking into custody any minor who is found violating any law, or whose arrest would be permissible under RSA 594:10, or who is reasonably believed to be a fugitive from justice, or whose circumstances are such as to endanger such minor's person or welfare, unless immediate action is taken.
N.H. Rev. Stat. Ann. § 169-B:9.  In addition to § 169-B:9, the defendants rely on §§ 169-C:6 and 169-D:8.  Analysis of § 169-B:9 suffices.

Jason had told Officer McClellan that his parents were not at home and that he wanted to go home with Dale. Jason also said he did not know how to reach them. Officer McClellan called Dale's mother to come pick up her son. He also told her, either over the phone or at the station, that he had taken Jason into custody because he suspected that Jason had been drinking. He asked if she would take Jason as well, but she declined to take responsibility for Jason. Her testimony confirms this. On Jason's suggestion, Officer McClellan also contacted the mother of Michael Palughi, with whom Jason had planned to spend the night. But after hearing the circumstances under which Jason was at the police station, she too refused to take custody of him. Her testimony confirms this. Having been unable to locate an adult who would take Jason, Officer McClellan drove Jason home at 3:01 a.m. and extracted a promise from him that he would stay home until he heard from his parents.

All of the material elements of Officer McClellan's account are consistent with the deposition testimony of the others involved. Jason testified that he and Dale had indeed drunk Kahlua that evening, accounting for the odor that Officer McClellan reported. Jason confirmed that he and Dale had been walking along East Maine Street at around 2:00 a.m. when Officer McClellan stopped them and that the bottoms of Dale's pants had been wet. According to Jason, the first thing that Officer McClellan said as

he approached the boys was that "I can smell alcohol on you all the way over here." Like Officer McClellan, Jason reported that a third officer at the police station determined that Dale smelled of alcohol and Jason did not. And Jason admitted that when Officer McClellan asked him where his parents were, he told him that they "were in Maine somewhere" and lied in stating that he did not know how to reach them. In addition, Jason reported that Officer McClellan asked both Dale's mother and Michael's mother if they would take responsibility for him.

Officer McClellan's testimony was also consistent, in all material respects, with the deposition testimony of Dale Bell. Dale testified that he drank most of a bottle of Kahlua that night, and that Jason also drank "a swig" of Kahlua. Dale also confirmed that Officer McClellan told both juveniles that they smelled of alcohol and asked them whether they had attended an earlier party because the bottom of Dale's pants were wet. Once at the police station, according to Dale, Jason told McClellan that his parents were out of town and Dale's mother refused to take Jason.

The deposition testimony of Dale's mother, Patricia Bell, and Michael's mother, Gail Palughi, provides further confirmation of Officer McClellan's story. Patricia Bell explained that Officer McClellan had called her late at night and told her that she needed to pick up Dale from the police station. When she arrived, Officer McClellan said that he believed Dale had attended an earlier

drinking party and had run away when the police took the partygoers into custody. He also told her that he believed that Dale had been drinking that night. Patricia Bell further testified that Officer McClellan asked her if she would take Jason home with her because the police were unable to locate his parents and that she declined this request.

Gail Palughi also testified that she received a late-night call from Officer McClellan in which he asked her whether she would be willing to take responsibility for Jason. Officer McClellan explained to her that Jason was at the police station and had been picked up because he smelled of alcohol. He also told her that her son Michael had been present when he had picked up Jason, but that he hadn't taken Michael into custody. Although she had earlier told Michael that Jason could stay over, Gail Palughi testified that she did not want to take responsibility for Jason under these circumstances.

Jason and his father brought suit against Officer McClellan under 42 U.S.C. § 1983, alleging that McClellan violated his First, Fourth, and Fourteenth Amendment rights when he took him into custody and then released him. He also sued the Town of Conway for allegedly promulgating a policy of "rounding up" juveniles based on their mere proximity to alcoholic beverages. In addition, Tremblay asserted several pendent tort claims against

Officer McClellan, including a negligence claim for releasing Tremblay without adult supervision.

The magistrate judge denied Officer McClellan's motion for summary judgment on his qualified immunity defense to the § 1983 claim.

**II.**

A. Appellate Jurisdiction

The parties agree that we have interlocutory appellate jurisdiction over the denial of the qualified immunity defense. Such jurisdiction ordinarily exists unless there are controlling issues of fact that must be resolved at the trial court level. See Behrens v. Pelletier, 516 U.S. 299, 305-07 (1996).

On the record, it is clear to us that no material facts are in dispute. It appears that the magistrate judge decided the merits of the immunity question against McClellan when he concluded "[t]here are no facts in the record that demonstrate that McClellan reasonably believed that Jason was in imminent danger when McClellan took Jason into custody." Of course, Officer McClellan's subjective intent is irrelevant. The test for qualified immunity in this context is an objective one. See Crawford-El v. Britton, 523 U.S. 574, 587-88 (1998); Stoutt v. Banco Popular de P.R., 320 F.3d 26, 31-32 (1st Cir. 2003).

B. Qualified Immunity Under § 1983

Our review of the district court's denial of summary judgment on qualified immunity grounds is de novo. Valente v. Wallace, 332 F.3d 30, 32 (1st Cir. 2003).

The Supreme Court has encouraged lower courts generally to address first the question whether at some abstract level the plaintiffs have asserted a violation of constitutional rights, second whether those rights are clearly established, and third whether a reasonable officer could have concluded that his actions did not violate plaintiffs' constitutional rights. See Saucier v. Katz, 533 U.S. 194, 201-02 (2001). That encouragement has led this court to describe the qualified immunity test as having three parts, see Suboh v. Dist. Attorney's Office of Suffolk Dist., 298 F.3d 81, 90 (1st Cir. 2002), though sometimes we have described it as a two-part test, see Santana v. Calderon, 342 F.3d 18, 23 (1st Cir. 2003).

The reason given for first addressing the alleged constitutional violation is that doing so assists in the development of the law on what constitutes meritorious constitutional claims. See Saucier, 533 U.S. at 201. In many cases that approach is useful, especially where some novel theory is advanced. The utility of this approach, however, depends on the level of generality that is permitted in stating the constitutional right at stake. Here, for example, if the question asked is framed

at the abstract level of whether a police officer may detain a person without any cause, then the plaintiffs have stated a claim under the Fourth Amendment.  But saying that does not clarify the law; it just crosses oft-tread ground.

Alternatively, the question could be framed as whether it is unconstitutional for a police officer, acting under a state protective custody statute, to detain a juvenile reasonably suspected to have been drinking and walking along a highway at two in the morning with an intoxicated juvenile companion.  This court has recognized that a state may temporarily separate a child from his or her parents, with additional due process protections to follow, on reasonable suspicion that the child is in imminent peril, for example, from child abuse.  Suboh, 298 F.3d at 92; Hatch v. Dep't for Children, Youth & their Families, 274 F.3d 12, 21 (1st Cir. 2001).  In Hatch, this court rejected the argument that something fairly close to probable cause was the constitutionally required standard.  See 274 F.3d at 21.  Here, the juveniles were not even separated from their parents, only from a darkened highway at 2 a.m., and were released almost immediately.

This analysis supports the constitutionality of a statute authorizing the temporary protective detention of a child when there is reasonable suspicion to believe that he or she is in immediate danger.  But it does not resolve whether the detention of Jason was authorized under New Hampshire law: while there is in our

view no federal constitutional bar to protective custody of a juvenile based on reasonable suspicion of immediate danger to the juvenile, the detention could still be unlawful, but not necessarily unconstitutional, if New Hampshire law required a higher level of suspicion. New Hampshire has not defined what quantum of suspicion or cause is needed to detain a juvenile under its protective custody statute.[4]

Although Saucier can be read as encouraging federal courts to decide unclear legal questions in order to clarify the law for the future, it surely did not mean to require federal courts to define and clarify unclear state statutes when this is wholly unnecessary to decide the case at hand. The plaintiffs are not contending that the U.S. Constitution compels New Hampshire to adopt a standard more stringent than reasonable suspicion for protective custody. In fact, the parties agree, as do we, that the ultimate question resolves into whether New Hampshire law authorized the officer's action based on a reasonable concern that Jason's welfare was endangered.

Even were a reasonable suspicion constitutional standard clearly established in 1999 for these circumstances, the question would be whether an objectively reasonable officer in Officer

---

[4]The New Hampshire statute makes clear that endangerment of a minor's welfare is a basis for custody but the language of the statute is silent as to the level of likelihood required under this prong.

McClellan's position could have understood that his actions did not violate the Fourth Amendment. This question could be considered to merge the second and third prongs of the immunity analysis. See Tower v. Leslie-Brown, 326 F.3d 290, 296 (1st Cir. 2003). On the undisputed facts, there is no doubt that a reasonable officer could have understood that his actions were authorized by the statute and constitutional.

An objectively reasonable officer in Officer McClellan's position could have believed that New Hampshire law required no more than reasonable suspicion of immediate endangerment for protective custody of a juvenile and could have had reasonable suspicion that Jason fit within the statutory requirements -- that is, that the circumstances were such that Jason's "person or welfare" was endangered. It is undisputed that when Officer McClellan encountered the two sixteen-year-olds, Jason's companion, Dale, appeared visibly intoxicated. Dale's eyes were glassy and bloodshot, he smelled of alcohol, and he had wet pant legs and shoes, indicia of the earlier drinking party. Dale had drinking problems in the past that were known to McClellan. There was also a reasonable basis to suspect that Jason had been drinking. The odor of alcohol came from "amongst" them. Jason was with Dale; making reasonable a suspicion that Jason had also been drinking and had attended the party along with Dale. It would be reasonable to suppose that the two of them would not have been walking along the

same road at two in the morning, one having been drinking and the other not.

The two were walking along a federal highway in the middle of the night; an objectively reasonable officer could have been concerned that juveniles under the influence of alcohol run a risk of being hit by a car. And a reasonable officer, with some basis to suspect that Jason had been drinking, could have been concerned that taking only Dale into custody and leaving Jason alone on the highway, not knowing where he would go, could endanger him.[5] Under the circumstances here, a reasonable officer could have believed that he or she was authorized to take Jason into protective custody and then to release him to his home.

### III.

The magistrate judge's denial of qualified immunity for Officer McClellan is **reversed**; the case is **remanded** to the district court judge with instructions to grant Officer McClellan's motion for summary judgment on qualified immunity and for further proceedings consistent with this opinion. No costs are awarded.

---

[5]Indeed, had the officer found that the two were illegally transporting alcoholic beverages, he would have been required to arrest them and could be liable in tort if he did not. Weldy v. Kingston, 128 N.H. 325, 331 (1986).

-15-